LEXSEE 2004 U.S. APP. LEXIS 4788

**AMNESTY AMERICA, suing in its representative capacity o/b/o arrestee victims of officially sanctioned, intentional and malicious physical brutality and excessive force to coerce the involuntary service of walking as arrestees and pre-trial detainees by police officers of the Town of West Hartford, CT, on April 1, 1989 and June 17, 1989, Plaintiff, WILLIAM E. WAUGH, SUZANNE C. VERDI, R.N., HARRY M. ONG, ELEANOR BRADY, arrestees and pre-trial detainees, suing o/b/o themselves and others similarly situated, and EDARD DOMBROSKI, Plaintiffs-Appellants, v. TOWN OF WEST HARTFORD, Defendant-Appellee, ROBERT McCUE, Chief of Police, Defendant.**

Docket No. 03-7332

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*2004 U.S. App. LEXIS 4788*

November 7, 2003, Argued
March 15, 2004, Decided

**PRIOR HISTORY:** [*1] Plaintiffs-appellants appeal from a decision of the United States District Court for the District of Connecticut (Dorsey, S.J.), granting summary judgment to defendant-appellee, the Town of West Hartford. Plaintiffs allege that the Town's police used excessive force in arresting them at two successive anti-abortion demonstrations in 1989, and that the Town may be held liable pursuant to *42 U.S.C. § 1983* for failing to train and failing to supervise the officers' use of force. We hold that plaintiffs have raised genuine issues of material fact as to whether excessive force was used at the two demonstrations and whether the Town may be held liable for failing to supervise the officers' conduct. *Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 2002 U.S. App. LEXIS 7003 (2d Cir. Conn., 2002)*

**DISPOSITION:** Affirmed in part, vacated in part and remanded.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** JOHN R. WILLIAMS, Williams & Pattis, New Haven, CT, for plaintiffs-appellants.

MARCIA J. GLEESON, Sack, Spector & Karsten, LLP, West Hartford, CT, for defendant-appellee.

**JUDGES:** Before:CARDAMONE, SOTOMAYOR, and KATZMANN, Circuit Judges.

**OPINIONBY:** SOTOMAYOR

**OPINION:** SOTOMAYOR, *Circuit Judge*:

Plaintiffs-appellants William E. Waugh, Suzanne C. Verdi, R.N., Harry M. Ong, Eleanor Brady, and Edward Dombroski (collectively, [*2] the "plaintiffs") appeal from the decision of the United States District Court for the District of Connecticut (Dorsey, S.J.), granting summary judgment in favor of defendant-appellee, the Town of West Hartford ("defendant" or "the Town"). In 1992, plaintiffs filed this lawsuit pursuant to *42 U.S.C. § 1983*, alleging that they were the victims of excessive force perpetrated by the Town's police officers at two peaceful anti-abortion protests that took place in West Hartford in 1989. The district court held that, *inter alia*, plaintiffs had not shown that the police officers' alleged actions at the demonstrations were taken pursuant to a municipal custom or policy, *see Monell v. Department of Social Services, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)*, and the plaintiffs therefore had failed to establish a basis upon which the Town could be held liable for the officers' actions.

On appeal, plaintiffs assert that the district court erred in granting summary judgment in favor of the

Town, arguing that their proffered evidence creates material issues of fact under two independent theories of municipal liability. First, plaintiffs claim that the [*3] Town failed to supervise its police force at both demonstrations, because its police chief was present at the demonstrations and allegedly witnessed the brutality but failed to stop it. Second, plaintiffs allege that the Town acted with deliberate indifference in failing to train its officers to arrest passively resisting protesters without using excessive force, even after the Town had received complaints about the use of force during the first demonstration. Plaintiffs also challenge the district court's striking of various pieces of plaintiffs' evidence as inadmissible.

For its part, the Town asserts that the district court's decision was correct in all respects, and also that we may affirm the decision on either of two independent bases. First, because plaintiffs' proffered affidavits are fourteen years old, the Town contends that they are insufficient to oppose a summary judgment motion absent an affirmative showing that the affiants remain competent to testify at trial. Second, the Town argues we should dismiss the appeal pursuant to *Fed. R. App. P. 28*, because plaintiffs' briefs lack legal arguments and adequate citations to the record. [*4]

We hold that (1) there are issues of material fact as to whether the Town's police officers used excessive force when they removed plaintiffs from the demonstrations and arrested them; (2) plaintiffs have proffered sufficient evidence to preclude summary judgment as to whether the Town may be held liable for failing to supervise its police officers; (3) plaintiffs have not proffered sufficient evidence to raise issues of fact as to the Town's failure to train its officers in the use of force; and (4) the district court was entitled to consider the remainder of plaintiffs' proffered affidavits, despite the fact that they were fourteen years old, because the Town did not present any evidence that the affiants are no longer available or competent to testify. Further, we note that the deficiencies in plaintiffs' briefs are sufficiently serious to warrant a warning to plaintiffs' counsel. We need not reach the merits of the district court's evidentiary rulings, although we note that at trial, plaintiffs are free to reiterate their objections to those rulings.

## BACKGROUND

This suit arises out of two anti-abortion demonstrations that took place in 1989 at the Summit Women's Center [*5] (the "Women's Center"), a West Hartford clinic that performed abortions. n1 The first demonstration occurred on April 1, 1989, when dozens of protesters gathered at the Women's Center. After the protesters entered the Women's Center, some remained in the reception area, and others chained themselves together in order to block entry to the area in which medical services were provided. The purpose of the demonstration was to prevent women from obtaining access to the Women's Center, and to ensure that no abortions were performed there that day.

> n1 The following facts are taken solely from evidence not excluded by the district court.

When the Town's police arrived and attempted to remove the demonstrators from the premises, the protesters employed "passive resistance" techniques to impede their arrest, including going limp, refusing to identify themselves, and refusing to unlock the chains that they had used to bind themselves together. It is undisputed that the police were forced to employ some degree of physical [*6] coercion in order to arrest the protesters and remove them from the premises. Plaintiffs allege, however, that the police responded with far more force than was necessary, and inflicted severe pain on the demonstrators by dragging them out of the building by their elbows, using choke holds, and lifting them off the floor by their wrists. Moreover, one officer allegedly shoved and pinned a sitting protester's head to the floor with his foot, and some threatened those who were praying aloud that they would "get more" if they "kept crying out in praise of the Lord." The protesters who were subjected to this treatment "screamed" in pain, and the demonstrators assert that they could hear the continuous screams and protestations of their fellow arrestees. By the end of the day, sixty-one protesters had been arrested; most were charged with trespass or criminal mischief, and a few were charged with assaulting officers. Plaintiffs further allege that those who were arrested were mistreated by police while being held in jail and while being escorted into the courtroom. Moreover, plaintiffs assert that many demonstrators suffered excruciating pain that caused some to black out, and others suffered [*7] lasting physical damage as a result of their treatment.

It is undisputed that the Town's police chief, Robert McCue, was present at the Women's Center during the demonstration, and that he supervised his officers' handling of the situation. The Town, for its part, asserts that McCue witnessed no brutality, and that the police utilized only "pain compliance techniques, which we refer to as 'come-along holds,' [that] were specifically designed and intended to allow officers to use the minimum necessary force to move arrestees." Come-along holds are assertedly designed to inflict only minimal pain, although "[t]he amount of pain is directly correlated to the amount of resistance." The police

purportedly employed come-along holds only after they were unsuccessful in verbally convincing protesters to move. The Town asserts that its officers complied with the police department's official, written policy on the use of force to make arrests, which states that "the basic rule is that in all cases an officer shall use only so much force as is necessary to make the arrest," and that the amount of force used must be proportional to the seriousness of the offense and the danger presented [*8] by the arrestee.

The alleged brutality that occurred during the April demonstration did not go unnoticed. On April 2, 1989, one day after the demonstration, *The Hartford Courant* ran a story on the arrests, including the claim that at least one protester had been beaten by police. Plaintiffs also allege that one protester's son attempted to complain to the police department, approaching McCue after the protester was arraigned and stating that he had witnessed police brutality. McCue allegedly replied that, as the Police Chief, he was responsible for the officers' actions during the arrests, and that he was not taking complaints. McCue, however, denies any recollection of complaints filed after the demonstration. The Town subsequently denied the allegation of brutality contained in the *Courant* article, and Chief McCue issued a press release on April 20, asserting that "as a matter of fact NO ONE received serious injury. NO ONE was denied medical treatment. . . . This Police Department will not be coerced, by false claims of brutality, into treating this type of criminal activity differently than any other."

After the demonstration, however, the police department developed [*9] a written policy for handling anti-abortion protests. The policy consisted of logistical instructions for each police squad, and provided that the demonstration and arrests were to be videotaped, all arrestees photographed at the scene, n2 and ambulances stationed at the demonstration site. Moreover, the policy instructed all officers to "present him or herself in a professional manner and . . . be conscious of the fact that they will be in a 'fish bowl,'" to "have absolutely no dialogue with antiabortion demonstrators . . . except that which is required for the conduct of official Police business," and to "not discuss in any fashion the demonstration event with members of the news media."

---

n2 Plaintiffs have not proffered any evidence as to whether these instructions were followed, and neither side has placed into evidence any videotapes or photographs of either demonstration, despite the obvious probative value that any extant documentation would have.

---

The second demonstration at the Summit Women's Center [*10] took place two months after the first, on June 17, 1989. The demonstrators again passively resisted arrest. Plaintiffs allege that the police again used excessive force, and that the protesters' screams of pain could be heard all around the clinic. Chief McCue was again present, and this time allegedly not only witnessed, but participated in, the brutality. One demonstrator asserts that McCue observed an officer putting his knee into the small of the demonstrator's back, after which McCue himself grabbed the demonstrator's hair and jerked his head back. Another states that she asked for the police chief and, after the officers pointed to McCue, she attempted to "crawl" over to him, at which point "one of the officers kicked [her] in the back, forcing [her] face down in the pavement[,] telling [her that] the Chief didn't want to speak to [her]." Yet another protester alleges that "Chief McCue watched as one by one [the protesters] were brought in to be cuffed and dragged out to the waiting buses. In the waiting room, under McCue's supervision, . . . two policemen tried their best to apply pressure to [her] wrists, thumbs, and fingers . . . . They had [her] face down [*11] on the rug, the left side of [her] face was pressed against the floor, and [she] felt what seemed to be a knee in [her] back . . . . They . . . began bending [her] wrists, thumbs and fingers, and were not satisfied until [she] cried out in pain."

In March 1992, the individual plaintiffs and Amnesty America, a self-described pro-life organization, filed suit against the Town and Chief McCue under *42 U.S.C. § 1983*, seeking damages and injunctive relief. Since then, the case has had an exceedingly tortured procedural history. Defendants quickly moved to dismiss the complaint, and the district court granted the motion in September 1992, concluding that Amnesty America did not have standing to sue on behalf of the individual plaintiffs because it had not alleged that it had any members who were present at either of the demonstrations. Plaintiffs moved for reconsideration, presumably on the ground that, regardless of whether or not Amnesty America had organizational standing, the individual plaintiffs who had been present at the demonstrations had standing and could prosecute the lawsuit. In September 1993, the district court adhered to its dismissal of [*12] the complaint in its entirety, but on different grounds. In upholding the dismissal, the court ruled that a two-year statute of limitations applied to plaintiffs' claims, and that the suit was therefore untimely.

Plaintiffs then appealed, and we reversed the district court's statute of limitations holding in October 1997. n3 *See Amnesty Am. v. Town of W. Hartford, 125 F.3d 843, 1997 WL 609469 (2d Cir. Oct. 2, 1997)* (unpublished opinion). On appeal, defendants conceded that the

district court's decision was in error and that plaintiffs' suit was timely, but they argued that "numerous technical deficiencies in the plaintiffs' brief and appendix" provided an independent basis for affirming the district court's dismissal of the case. *Id. [WL] at *1*. Although we were "sympathetic to the defendants' frustration with the plaintiffs' less than artfully pled" briefs, we declined to affirm on this basis. We reversed the district court's statute of limitations holding, and remanded for further proceedings. *Id. [WL] at *2*.

> n3 The appeal was repeatedly withdrawn and reinstated, and was finally submitted to this Court in mid-1997.

[*13]

On remand, n4 the Town moved for summary judgment at the close of discovery, and the district court granted the motion in an unpublished order in May 2001. The district court noted that plaintiffs had submitted "hundreds of pages of exhibits," but their briefs did not include any citations to particular exhibits. Because "it is plaintiffs' obligation to *demonstrate* that there is a genuine issue of material fact," the court declined to "surmise which portions of which exhibits support which claim," and concluded that plaintiffs had failed to proffer any evidence of police wrongdoing or the Town's liability.

> n4 After the case was reopened, plaintiffs filed a Fourth Amended Complaint, which named the Town as the only defendant.

Plaintiffs appealed, and we vacated and remanded. *See Amnesty Am. v. Town of West Hartford, 288 F.3d 467 (2d Cir. 2002)*. We noted that the district court was "justifiably frustrated" with plaintiffs' voluminous and inaccessible submissions. *Id. at 469.* [*14] Because the local rules of the District of Connecticut in effect at the time of the district court's decision did not require specific citations to the record, however, we held that the district court incorrectly dismissed the case without first giving plaintiffs notice and an opportunity to remedy the deficiencies in their motion papers. *See id. at 471-72*. Although *Fed. R. Civ. P. 56* "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute[,] . . . in the absence of a local rule, a district court may not grant summary judgment on the ground that the nonmovant's papers failed to cite to the record unless the parties are given actual notice of the requirement." *Id. at 470-71*. We therefore vacated the court's decision and remanded for further proceedings.

On remand, the district court treated the Town's motion for summary judgment as outstanding, and ordered the plaintiffs to submit a revised brief and statement of material facts, "amended only to the extent necessary to provide citations to the specific evidence in the record already [*15] submitted." n5 Plaintiffs filed an opposition brief and statement of material facts that included not only citations to their already-submitted affidavits, but also additional factual allegations and details. The district court consequently struck both filings.

> n5 Local Rule 9(c), which governed summary judgment motion filings, had been amended subsequent to the district court's initial summary judgment motion, and now required motion papers to contain citations to affidavits or other admissible evidence. D. Conn. L. Civ. R. 9(c)(3) (2001) (renumbered at D. Conn. L. Civ. R. 56(a)(3) (2003)).

Plaintiffs then filed truncated opposition papers that contained little legal analysis beyond a sketch of the relevant case law, and in lieu of factual analysis, a three-page string citation to various affidavits in the record. In March 2003, the district court again granted summary judgment for the Town. The court first struck several of plaintiffs' affidavits as unsworn or improperly executed, and various letters and [*16] other documents as hearsay. It next castigated plaintiffs for neglecting to provide any unified system of page numbering by which the court could locate particular affidavits within their 500-page evidentiary submission, failing to provide any analysis beyond the conclusory statement that material issues of fact precluded summary judgment, and submitting as affidavits handwritten documents that contained hearsay, speculation, and religious exhortations.

Turning to the merits, the court concluded that plaintiffs had not demonstrated that the Town could be held liable for the officers' actions, because plaintiffs had failed to raise issues of fact as to whether the police officers acted pursuant to a municipal policy or custom of using excessive force to effect arrests. Plaintiffs advanced two theories of municipal liability to the court, although they did not clearly articulate or analyze either one. First, plaintiffs asserted that McCue, a municipal official with policymaking authority, had been present at the demonstrations, but had failed to properly supervise his officers or prevent violence from occurring. Second, plaintiffs argued that the Town had ample notice of the

allegations [*17] of brutality at the first demonstration, and therefore its failure to provide its officers with additional training before the second demonstration amounted to deliberate indifference. The court acknowledged plaintiffs' numerous proffered affidavits alleging instances of brutality, but concluded that none of the allegations established that the police had used excessive force, or that such force was used pursuant to a municipal policy. The court also discounted plaintiffs' evidence that McCue was present at both demonstrations and witnessed the alleged brutality, reasoning that McCue's presence in itself did not establish that the police officers had acted pursuant to a municipal policy, and that there was no evidence that McCue had been unresponsive to complaints of brutality. The court thus held that "plaintiffs produce no evidence to show that McCue failed to supervise the officers, or that he failed to investigate repeated complaints of excessive use of force."

This appeal followed.

## DISCUSSION

On appeal, plaintiffs challenge both the district court's holding on the merits and its evidentiary rulings. Plaintiffs contend that the evidence considered by the district court [*18] is sufficient to raise issues of fact as to whether McCue failed to supervise the police officers who made arrests at the two demonstrations, and whether McCue and the Town failed to train the officers in the proper use of force in making arrests after the events at the first demonstration evidenced the need for such training. With respect to the court's evidentiary rulings, plaintiffs argue that the court abused its discretion in excluding some documentary evidence as hearsay, and striking a number of affidavits on technical grounds.

The Town takes issue with each of plaintiffs' contentions as to the merits of their claims. It also argues that plaintiffs' briefs and evidentiary submissions contain deficiencies that give rise to two independent bases for affirming the district court's decision in its entirety. First, the Town asserts that, because plaintiffs' proffered affidavits are fourteen years old, they are insufficient to oppose a summary judgment motion absent an affirmative showing that the affiants remain competent to testify at trial. Second, the Town argues we should dismiss the appeal pursuant to *Fed. R. App. P. 28*, because plaintiffs' [*19] briefs lack legal arguments and adequate citations to the record.

## I. Standard of Review

We review the grant of a motion for summary judgment *de novo*. *See Brody v. Village of Port Chester, 345 F.3d 103, 108 (2d Cir. 2003)*. In determining whether there are genuine issues of material fact that preclude judgment for the defendant as a matter of law, we must resolve all ambiguities in favor of the nonmoving parties. *See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)*. The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)*. Thus, we will affirm the district court's grant of summary judgment only if, taking all of plaintiffs' evidence as true, we find that no reasonable juror could conclude that plaintiffs have established that the Town's police violated plaintiffs' constitutional rights under circumstances subjecting the Town to liability under § 1983.

## II. Plaintiffs' [*20] Allegations of Excessive Force

The foundation of plaintiffs' suit against the Town is their contention that the degree of force used by the police officers at both demonstrations was excessive under the circumstances, such that the officers violated plaintiffs' *Fourth Amendment* right against unreasonable seizure. *See, e.g., Neighbour v. Covert, 68 F.3d 1508, 1511 (2d Cir. 1995)* (per curiam) (determining whether plaintiffs' constitutional rights had been violated before considering municipal liability). Although the district court ultimately went on to consider whether the Town could be held liable for any unconstitutional force that was used, it based its dismissal of plaintiffs' claims in part on its conclusion that plaintiffs had not proffered evidence that the police used excessive force that deprived plaintiffs of their constitutional right against unreasonable arrest. The court reasoned that "plaintiffs cite to no caselaw which holds that use of reasonable force to move limp and noncooperating arrestees, nor that the means used, gives rise to a claim of excessive force." We find, however, that the district court improperly resolved issues of fact against [*21] the plaintiffs in reaching this conclusion.

In order to establish that the use of force to effect an arrest was unreasonable and therefore a violation of the *Fourth Amendment*, plaintiffs must establish that the government interests at stake were outweighed by "the nature and quality of the intrusion on [plaintiffs'] *Fourth Amendment* interests." *Graham v. Connor, 490 U.S. 386, 396, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)*. In other words, the factfinder must determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time. *Id. at 397*. The inquiry therefore "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether

he is actively resisting arrest or attempting to evade arrest by flight." *Id. at 396*. Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that [*22] the officers' conduct was objectively unreasonable. *See O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)*.

Plaintiffs' allegations are sufficient to create issues of fact as to the objective reasonableness of the degree of force used by the police officers. Plaintiffs aver that their resistance to arrest was purely passive, and that the police used more force than was necessary to remove them from the clinic. According to plaintiffs, the police officers' excessive uses of force included lifting and pulling plaintiffs Waugh and Verdi by pressing their wrists back against their forearms in a way that caused lasting damage; throwing Waugh face-down to the ground; dragging Dombroski face-down by his legs, causing a second-degree burn on his chest; placing a knee on Ong's neck in order to tighten his handcuffs while he was lying face-down; and ramming Ong's head into a wall at a high speed. n6 We have previously held that allegations involving comparable amounts of force used during the arrest of a nonviolent suspect are sufficient to allow a reasonable factfinder to conclude that the force used was excessive. *See, e.g., Robison v. Via, 821 F.2d 913, 923-24 (2d Cir. 1987)* [*23] (holding that allegations that police yanked arrestee out of a car, threw her against it, and pinned her arm behind her back were sufficient to withstand summary judgment).

---

n6 Although plaintiffs filed this lawsuit as a putative class action, the district court denied their motion for class certification in 1999, and plaintiffs have not appealed that ruling. Because plaintiffs are suing only on behalf of themselves, they have standing to assert only those constitutional deprivations that they themselves are alleged to have suffered, and only evidence of those acts of brutality perpetrated on plaintiffs themselves is relevant to that determination. Of course, plaintiffs' proffered evidence as to force allegedly suffered by other demonstrators who are not named plaintiffs remains relevant to the determination of deliberate indifference and municipal liability. *See infra* Part III.B.

---

In evaluating plaintiffs' allegations, the factfinder will have to judge the officers' actions in light of the situation as [*24] it appeared at the time. *Graham, 490 U.S. at 396*. Plaintiffs conducted their demonstration in a manner calculated to prevent patients and doctors from obtaining access to the clinic, positioning themselves not only in front of and around the Women's Center, but also in its waiting room, hallways, and examination rooms. Moreover, they purposefully made themselves more difficult to arrest or carry by chaining themselves together and covering their hands with maple syrup to impede the use of handcuffs. The police officers were therefore forced "to make split-second judgments," in "tense, uncertain, and rapidly evolving" circumstances, *Graham, 490 U.S. at 397*, as to how to remove the demonstrators and restore access to the clinic in the most humane and efficient way possible. It is entirely possible that a reasonable jury would find, as the district court intimated, that the police officers' use of force was objectively reasonable given the circumstances and the plaintiffs' resistance techniques. *Cf. Forrester v. City of San Diego, 25 F.3d 804, 807-08 (9th Cir. 1994)*. Because a reasonable jury could also find that the officers gratuitously [*25] inflicted pain in a manner that was not a reasonable response to the circumstances, however, the determination as to the objective reasonableness of the force used must be made by a jury following a trial.

### III. The District Court's Ruling on Municipal Liability

The district court next held that, even if plaintiffs had raised issues of fact as to whether their constitutional rights were violated, they had not proffered sufficient evidence from which a factfinder could conclude that the Town should be held liable for the police officers' conduct. Although plaintiffs' brief on appeal is rather opaque as to their legal theories of municipal liability, plaintiffs argued below that the Town should be held liable for the officers' alleged use of excessive force because it failed to supervise the officers at both demonstrations, and failed to train the officers after their conduct at the first demonstration evidenced a need for additional training. We find that plaintiffs have proffered ample evidence to raise genuine issues of material fact as to their failure to supervise theory, but that they have not submitted sufficient evidence from which a reasonable jury could conclude [*26] that the Town is liable for any failure to train its officers.

### A. Demonstrating Municipal Liability

In *Monell v. Department of Social Services, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)*, the Supreme Court established that "local governing bodies . . . can be sued directly under [*42 U.S.C.*] § *1983* for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id. at 690*. The Court reached this conclusion by first holding that

municipalities were "persons" within the meaning of § 1983. *Monell* then found that the language of § 1983, which provides that "every person who . . . *subjects, or causes to be subjected*, any . . . person . . . to the deprivation of rights . . . secured by the Constitution . . . shall be liable to the party injured," *42 U.S.C. § 1983* (emphasis added), requires a causal connection between the actions of the municipality itself and the alleged constitutional violation. *See Monell, 436 U.S. at 691-92.* [*27] Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees.

*Monell* established that alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself. *Id. at 694; see also Pembaur v. City of Cincinnati, 475 U.S. 469, 479-80, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986).* Conversely, constitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation. *Id.* Thus, a city cannot be held liable under § 1983 on a theory of *respondeat superior*.

Later cases have considerably broadened the concept of official municipal [*28] action. In *Pembaur v. City of Cincinnati*, the Court recognized that although the phrase "'official policy' often refers to formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed . . . consistently and over time," a city "frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations." *Pembaur, 475 U.S. at 480-81.* Thus, when a city decides "to adopt [a] particular course of action[,] . . . it surely represents an act of official government 'policy' as that term is commonly understood." *Id. at 481.* It is not necessary, therefore, for plaintiffs to prove that a municipality has followed a particular course of action repeatedly in order to establish the existence of a municipal policy; rather, a single action taken by a municipality is sufficient to expose it to liability.

Moreover, municipal liability does not lie only where the official policy or ordinance is itself unconstitutional. *See City of Canton, Ohio v. Harris, 489 U.S. 378, 387, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989); Fiacco v. City of Rensselaer, New York, 783 F.2d 319, 326 (2d Cir. 1986).* [*29] Where a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy, the city may be held liable for its employees' unconstitutional acts. Such circumstances may be found, for example, where the city is aware that its policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them, *City of Canton, 489 U.S. at 387,* or where the city's official policy on the reasonable use of force in arrests is valid, but the city's actual practice is to use excessive force, *see Fiacco, 783 F.2d at 327* (stating that the practice of using excessive force can be the basis for municipal liability even though the city's policy on force is itself constitutional).

Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, or by a city employee's single tortious decision or course of action, the inquiry focuses on whether the actions of [*30] the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers. *Pembaur, 475 U.S. at 481-82.* Thus, even a single action by a decisionmaker who "possesses final authority to establish municipal policy with respect to the action ordered," *id.*, is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983.

More often than not, however, plaintiffs allege constitutional deprivations at the hands of the lower-level municipal employees to whom some authority has been delegated, rather than at the hands of those officials with final policymaking authority. While allowing the municipality to be held liable on the basis of the mere delegation of authority by a policymaking official would result in *respondeat superior* liability, allowing delegation, without more, to defeat municipal liability would contravene the remedial purposes of § 1983. Therefore, § 1983 plaintiffs may establish that the [*31] city is liable for their injuries by proving that "the authorized policymakers approve[d] a subordinate's decision and the basis for it." *City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988)* (plurality opinion).

Thus, when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority. One means of doing so, of course, is to

establish that a policymaker ordered or ratified the subordinates' actions. *See Weber v. Dell, 804 F.2d 796, 803 (2d Cir. 1986)* (holding that liability could be premised on sheriff's ordering of unconstitutional strip searches). Another method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions. *See, e.g., Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992)* (stating that municipal liability [*32] lies where the subordinate's misconduct is "so manifest as to imply the constructive acquiescence of senior policy-making officials"). Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a "deliberate choice," that acquiescence may "be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, 489 U.S. at 388* (citations omitted); *see also Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995), Jeffes v. Barnes, 208 F.3d 49, 63 (2d Cir. 2000)* (holding that sheriff's acquiescence in unconstitutional retaliation could be inferred from his tolerance and encouragement of harassment of plaintiffs). Moreover, because a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability.

### B. Plaintiffs' Theories of Municipal Liability

Plaintiffs here assert that the alleged use of excessive force, although committed by subordinate-level police [*33] officers, is chargeable to the Town because of Chief McCue's presence at the demonstrations. As the Town concedes that McCue has final policymaking authority with respect to the actions of the police force, plaintiffs argue that McCue ratified the officers' alleged brutality by acting with deliberate indifference in failing to prevent the violence at each demonstration. Plaintiffs advance two distinct theories of McCue's deliberate indifference, alleging that he failed to supervise the officers and also that he failed to train them. n7 Because these theories emphasize different facts and require different showings in order to establish deliberate indifference, n8 they must be analyzed independently, rather than evaluated collectively, as in the district court's analysis.

---

n7 The Town argued below, and the district court accepted, that the Town's written policy on the use of force in arrests, and its written policy on handling anti-abortion protests, are constitutional, and the Town is therefore insulated from § 1983 liability. Plaintiffs do not argue that the policy as written is unconstitutional, however. As discussed above, plaintiffs need not allege that the Town's official policies are themselves unconstitutional. *See City of Canton, 489 U.S. at 386-87; Fiacco, 783 F.2d at 331-32* (stating that city's failure to implement its valid policies by requiring police officers to abide by them could give rise to liability for failure to supervise its officers). Rather, plaintiffs' claims are based on the police officers' alleged disregard of the Town's stated policies. [*34]

n8 While a failure to supervise claim requires allegations as to the violation itself and policymakers' reaction to it, a failure to train claim also requires evidence as to the city's training program and the way in which that program contributed to the violation. *See infra* Part III.B. 2. Moreover, in the context of a failure to supervise case, deliberate indifference may be established by showing that policymaking officials deliberately ignored an obvious need for supervision. *Vann, 72 F.3d at 1049*. In the failure to train context, on the other hand, plaintiffs must establish that the officials consciously disregarded a *risk* of future violations of clearly established constitutional rights by badly trained employees. *See City of Canton, 489 U.S. at 389-90*.

---

### 1. Failure To Supervise

Plaintiffs' first theory of municipal liability is that the need to supervise the police officers' conduct at both demonstrations should have been obvious to Chief McCue because he allegedly witnessed the brutality, but that he nonetheless failed to supervise the [*35] officers in a way that would have prevented the violation of plaintiffs' constitutional rights. In *Fiacco v. City of Rensselaer, 783 F.2d at 326-27*, we held that plaintiffs injured by a police officer's use of excessive force may establish a basis for municipal liability by alleging that the city's policymakers were "knowingly and deliberately indifferent to the possibility that its police officers were wont" to violate the constitutional rights of arrestees. *Id. at 326*. In this context, plaintiffs must establish McCue's deliberate indifference by showing that "the need for more or better supervision to protect against constitutional violations was obvious," but that McCue made "no meaningful attempt" to forestall or prevent the unconstitutional conduct. *Vann, 72 F.3d at 1049*.

Plaintiffs have proffered ample evidence from which a reasonable factfinder could conclude that the necessity for more supervision was glaringly obvious at both demonstrations and that McCue ignored the alleged constitutional violations in progress. Plaintiffs' proffered affidavits, if credited, establish that at both demonstrations, police officers inflicted [*36] severe pain on arrestees and made comments suggesting that they intended to inflict pain, and that continuous screams of pain punctuated the demonstrations. Thus, plaintiffs' evidence would allow a reasonable factfinder to conclude that violence did not occur as an isolated instance, involving a few protesters and officers in one physical location, but that it permeated the entire arrest scene. Given this environment, a factfinder could infer from McCue's presence at the demonstrations that he must have witnessed the violence and heard the screams. Plaintiffs also aver that, during the second demonstration, McCue not only observed, but actively encouraged and supervised some of the allegedly brutal treatment of the arrestees, including "yank[ing]" one arrestee's head up by the hair, and failing to intervene as another protester's face was pressed to the floor while an officer put a knee into her back.

The Town argues, however, that the district court correctly concluded that plaintiffs failed to raise a genuine issue of material fact as to McCue's failure to supervise because they have not proffered evidence that the demonstrators repeatedly complained about the excessive force [*37] after the demonstrations, or that McCue repeatedly failed to investigate such complaints. This argument is misplaced. While we have held that proof of a policymaker's failure to respond to repeated complaints of civil rights violations would be sufficient to establish deliberate indifference, *Vann, 72 F.3d at 1049*, we have never required such a showing. The means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing. The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a "conscious choice" rather than mere negligence. *City of Canton, 489 U.S. at 389* (internal quotation marks omitted); *see also Bd. of County Comm'rs v. Brown, 520 U.S. 397, 410, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997)* (stating that "deliberate indifference . . . requires proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction (internal quotation marks omitted)).

Thus, plaintiffs' evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that [*38] the need for corrective action or supervision was "obvious," *Vann, 72 F.3d at 1049*, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction. Considered under this standard, plaintiffs' proffered affidavits are sufficient to withstand summary judgment, because the evidence allows the inference that McCue himself witnessed (and perhaps encouraged) the unconstitutional conduct, and that the conduct was so blatantly unconstitutional that McCue's inaction could be the result of deliberate indifference to the protesters' constitutional rights.

Rather than considering plaintiffs' allegations as a whole, the district court treated each allegation as to McCue and the officers' actions as an isolated act, leading it to conclude that none of plaintiffs' allegations that McCue witnessed or encouraged the brutality indicated that he was acting pursuant to a municipal policy. This analysis of the evidence, however, misapprehends both the force of plaintiffs' evidence, and the showing necessary to establish municipal liability. A reasonable factfinder, considering the demonstrators' [*39] allegations together and viewing McCue's conduct as a whole rather than as a series of unconnected acts, could conclude that McCue's conduct throughout the two demonstrations evinced deliberate indifference to the demonstrators' rights. More importantly, even under the district court's view of the evidence, plaintiffs' allegations may have been sufficient to withstand summary judgment. Because deliberate indifference need not be proven by any particular method, and need not involve allegations of a repeated failure to act, McCue's witnessing of a single, isolated act of brutality might be sufficient to allow a factfinder to infer deliberate indifference if the use of force were so extreme as to leave no doubt that McCue consciously chose not to act. n9 *See Turpin v. Mailet, 619 F.2d 196, 202 (2d Cir. 1980)* (noting that while a single instance of inaction on policymaker's part may not be sufficient to establish deliberate indifference, a "single, unusually brutal or egregious beating administered by a group of municipal employees" may support an inference that the conduct was attributable to inadequate supervision "amounting to deliberate indifference"). Moreover, as [*40] discussed above, a single instance of deliberate indifference on the part of a policymaker is sufficient to provide a basis for municipal liability; there is no need, as the district court apparently assumed, to establish that policymaking officials maintained a consistent "policy" of deliberate indifference.

---

n9 We express no opinion, however, as to whether any one of plaintiffs' allegations as to the conduct witnessed by McCue, if credited, could be sufficient in itself to establish that McCue's inaction constituted deliberate indifference.

### 2. Failure To Train

Plaintiffs also claim that McCue failed to train the officers not to use excessive force in making arrests after the events at the first protest demonstrated the need for better training. In *City of Canton, Ohio v. Harris*, the Supreme Court established that a municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its [*41] policies without more training. See *City of Canton, 489 U.S. at 387-90*. Plaintiffs contend that they have proffered sufficient evidence for a reasonable factfinder to conclude that the Town's failure to train constituted deliberate indifference within the meaning of *City of Canton and Walker v. City of New York, 974 F.2d 293 (2d Cir. 1992)* (establishing three-pronged test for demonstrating deliberate indifference in the context of a failure to train claim). They have neglected to offer any evidence, however, as to the purported inadequacies in the Town's training program and the causal relationship between those inadequacies and the alleged constitutional violations. Insofar as plaintiffs' claim is premised on a failure to train, therefore, we affirm the district court's grant of summary judgment.

*City of Canton* requires that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that that deficiency is "closely related to the ultimate injury, [*42] " such that it "actually caused" the constitutional deprivation. *City of Canton, 489 U.S. at 391*. Thus, the Supreme Court emphasized in *City of Canton* that plaintiffs must establish that "the officer's shortcomings . . . resulted from . . . a faulty training program" rather than from the negligent administration of a sound program or other unrelated circumstances. n10 *Id. at 390-91*. The elements of an identified training deficiency and a close causal relationship, which together require the plaintiffs to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train theory does not collapse into *respondeat superior* liability.

---

n10 Our holding in *Walker v. City of New York* is not to the contrary. There, after delineating the showing necessary to establish that a city's failure to train is the result of deliberate indifference, we held that the plaintiff should have an opportunity to prove, after discovery, that the city had failed to train its assistant district attorneys and police officers, and that the need for better training was so obvious that the failure to train would amount to deliberate indifference. *Walker, 974 F.2d at 300*. Because the district court had dismissed Walker's case at the motion to dismiss stage, rather than on summary judgment, we did not require him to identify a specific deficiency in the district attorney's training program or to establish a causal link between the lack of training and the misconduct. It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation. After discovery, on the other hand, a plaintiff is expected to proffer evidence from which a reasonable factfinder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation. See *Brown, 520 U.S. at 409* (stating that *City of Canton* required plaintiffs to show "that a municipality has failed to train its employees" in addition to establishing that the failure to train could constitute deliberate indifference).

---

[*43]

Plaintiffs here have proffered no evidence of the Town's training programs or advanced any theory as to how a training deficiency caused the police officers to use excessive force at the second demonstration. Plaintiffs' failure to train theory is based solely on their evidence that the police used excessive force on two successive occasions. *City of Canton* unequivocally requires, however, that the factfinder's inferences of inadequate training and causation be based on more than the mere fact that the misconduct occurred in the first place. n11 *Id. at 390-92* ("To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983."); see also *Dwares v. City of New York, 985 F.2d 94, 101 (2d Cir. 1993)* (stating that an allegation of an instance of police misconduct was insufficient to raise the inference that the police had been improperly trained). It is impossible to prevail on a claim that the Town's training program was inadequate without any evidence as to whether the Town trained its officers between the two demonstrations, how the training was conducted, how better or different training could have prevented [*44] the challenged conduct, or how "a hypothetically well-trained officer would have acted under the circumstances" to remove passively resisting protesters. *City of Canton, 489 U.S. at 391*. Moreover, plaintiffs have provided no evidence tending to rule out those causes of the excessive force that would not support

municipal liability, such as the negligent administration of a valid program, or one or more officers' negligent or intentional disregard of their training, and therefore no reasonable factfinder could conclude that the excessive force occurred as a result of training deficiencies. *See id. at 390-91*. Because plaintiffs have failed to raise an inference that the police were improperly trained and that this training caused them to use excessive force, we affirm the district court's grant of summary judgment as to this theory of municipal liability.

> n11 Because we affirm the district court's decision as to this claim on the ground that plaintiffs have failed to proffer any evidence as to the inadequacies of the training program and causation, we express no opinion as to whether plaintiffs have proffered sufficient evidence to allow a factfinder to conclude that any failure to train would have been deliberately indifferent within the meaning of *Walker, 974 F.2d at 297-98*.

[*45]

V. The Competence To Testify of Plaintiffs' Affiants

The Town argues that, regardless of the strength of plaintiffs' evidence, the age of their proffered affidavits provides an independent basis for affirming the district court's decision in full, because *Fed. R. Civ. P. 56(e)* requires affidavits to "show affirmatively that the affiant is competent to testify." All of plaintiffs' submitted affidavits were prepared shortly after the demonstrations took place - well before plaintiffs filed suit - and are therefore approximately fourteen years old. The Town argues that, given the age of this evidence, plaintiffs should be required to show that the affiants are currently still competent and available to testify. We hold that the district court was entitled to assume that the affiants would be available and competent to testify at trial because the affidavits facially satisfied the requirements of *Fed. R. Civ. P. 56(e)*, and because defendant presented no evidence that any of the affiants were no longer available.

All forty-four of the affidavits submitted by plaintiffs and not excluded by the [*46] district court on other grounds contain sufficient information for the court to infer that the bulk of the statements within them were made on personal knowledge, and all contain evidence that would be admissible at trial. n12 Thus, the affidavits satisfied the requirements of *Fed. R. Civ. P. 56(e)* at the time that they were sworn. Although the age of the affidavits may give rise to speculation that some of the affiants are no longer available to testify at trial, age alone is an insufficient basis upon which to disregard plaintiffs' otherwise admissible evidence. Because attorneys, as officers of the court, are presumed not to offer in opposition to summary judgment evidence that they have no good faith basis to believe will be available or admissible at trial, the burden is on the moving party to demonstrate that facially adequate affidavits that comply with *Rule 56(e)* should not be considered valid evidence. Here, the Town proffered no evidence that any of the affiants are no longer available, willing, or otherwise competent to testify at trial. In the absence of such evidence, the district court was correct to consider the substance of those [*47] affidavits that it did not exclude for other reasons in determining the existence of triable issues of fact. n13 *See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 135 n. 9 (4th Cir. 2002)* (assuming that affiants were competent to testify in the absence of specific evidence to the contrary).

> n12 Some of the affidavits contain hearsay statements and speculation, however, and as these elements of the affidavits would be inadmissible at trial, the district court was free to disregard them. *See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 71-72 (2d Cir. 2000)*.
>
> n13 For their part, plaintiffs challenge the district court's exclusion of a number of their proffered exhibits and affidavits. Because the evidence considered by the district court was sufficient to withstand summary judgment, we need not review the district court's evidentiary rulings.
>
> We note, however, that the court's exclusion of three letters to and from Town officials, on the ground that they contained hearsay statements that would be inadmissible at trial, is troubling. Plaintiffs proffered a letter from the Town's Assistant Corporation Counsel, Patrick Alair, denying allegations that any violence occurred during the April 1989 demonstration; a letter purportedly from Connecticut General Assemblyman Gene Migliaro, complaining about the alleged brutality; and a letter from Chief McCue to Migliaro, suggesting that the Migliaro letter was a forgery and offering to discuss the allegations of brutality surrounding the two demonstrations. If plaintiffs offer these letters to show that the Town and McCue had notice of the allegations, or that the Town's officials denied the allegations, their probative value will not depend on the truth of their contents. *See Fed. R. Evid. 801(c); Fun-Damental Too, Ltd. v. Gemmy Indus.*

*Corp., 111 F.3d 993, 1003-04 (2d Cir. 1997)*. Further, the letters from the Town's attorney and McCue are statements of the party-opponent or its agents, and thus may be admissible non-hearsay under *Fed. R. Evid. 801(d)(2)*. The letters, once properly authenticated, are potentially admissible at trial, and the district court should revisit this issue if plaintiffs seek to offer the letters in evidence.

We also note that plaintiffs need not limit their evidence at trial to the submissions they have chosen to offer in opposition to summary judgment. Because the scope of evidence presented at trial is limited solely by compliance with discovery obligations and the Federal Rules of Evidence, plaintiffs may offer into evidence any admissible material properly obtained or disclosed during discovery. Moreover, plaintiffs may present the testimony of witnesses whose affidavits were excluded at the summary judgment stage if that testimony is otherwise admissible.

[*48]

## VI. The Deficiencies in Plaintiffs' Submissions to This Court

Finally, the Town argues that plaintiffs' appellate briefs fail to advance any legal arguments as to how their evidence demonstrates a failure to train or supervise, and does not contain meaningful citations to the record evidence contained in the parties' appendix. This failure, the Town contends, provides an independent basis for dismissing plaintiffs' appeal. *Fed. R. App. P. 28* requires an appellant's brief to contain an argument section detailing the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies," *Fed. R. App. P. 28(a)(9)(A)*, as well as specific citations to the appendix, *id. 28(e)*. Although we agree that plaintiffs' brief is seriously deficient in these respects, we decline to dismiss the appeal on this basis. *See Fed. R. App. P. 2*.

Plaintiffs' appellate briefs, much like their summary judgment submission to the district court, consists of an eleven-page primer on municipal liability doctrine [*49] with almost no application of the law to the facts of this case. Although the brief does assert that plaintiffs' evidence is sufficient to satisfy one or another theory of municipal liability, it does so in a conclusory fashion, simply stating, without a single citation to the record, that plaintiffs have demonstrated the requisite legal elements of their claim. Moreover, although plaintiffs challenge the district court's exclusion of numerous documents and affidavits, they utterly fail to provide citations to the pages of the appendix at which the documents at issue appear. Plaintiffs' brief is therefore little more than "a doctrinal recapitulation masquerading as a legal argument," "tantamount to an invitation [for us] to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant." *Sioson v. Knights of Columbus, 303 F.3d 458, 460 (2d Cir. 2002)* (per curiam) (internal quotation marks omitted) (alterations in original).

Plaintiffs' appendix is also deficient. It contains roughly five hundred pages of affidavits and other documentary evidence that plaintiffs submitted to the district court in opposition to the [*50] Town's summary judgment motion. There is no table of contents listing the page on which a particular affidavit may be found; the only way to find any one of the sixty submitted affidavits is to hunt through the sizable record page by page. Moreover, although some demonstrators submitted two or more affidavits, plaintiffs do not distinguish between them, and for no apparent reason, some affidavits are included twice in the appendix. Finally, as the district court noted, many of the affidavits themselves are handwritten, illegible, contain numerous hearsay statements, or lengthy religious exhortations that are irrelevant to the operative issues. While the Federal Rules do not require that affidavits be submitted in any particular form, we are of the opinion that plaintiffs' presentation of their evidence is at best unprofessional, and at worst, detrimental to their chances of prevailing on their claims.

The deficiencies in plaintiffs' submissions are all the more troubling because plaintiffs' counsel, John R. Williams, has repeatedly disregarded the rules of both this Court and the district courts in which he practices. Indeed, we have repeatedly cited his utter failure to include [*51] legal argument in his briefs and his carelessness with his submissions and arguments. On occasion, we have gone so far as to decline consideration of the merits of his client's appeal as a result. *See, e.g., Sioson, 303 F.3d at 459-60* (stating that "perhaps counsel for Appellant [Williams] intends that we form an argument for him . . . but that is simply not our job, at least in a counseled case," and dismissing the appeal for failure to comply with *Fed. R. App. P. 28*); *Linardos v. Fortuna, 157 F.3d 945, 948 (2d Cir. 1998)* (noting "the several erroneous legal arguments advanced by [plaintiff's] counsel in the district court and on this appeal"); *see also Quoka v. City of W. Haven, 64 Fed. Appx. 830, 832 (2d Cir. 2003)* (unpublished decision) (noting that Williams failed "to comply with Local Rule 56(a)(3), which requires that each assertion in a Rule 56(a) statement be followed by a citation to an affidavit or admissible evidence supporting the assertion");

*MacGovern v. Hamilton Sunstrand Corp.*, 50 Fed. Appx. 59, 60 (2d Cir. 2002) (unpublished decision) (deciding the appeal in spite of the fact that [*52] "we rather doubt that the Appellant's Brief meets the requirements of [*Fed. R. App. P.] 28(a)*" because "the brief barely applies that law to those facts"); *Miner v. Sheridan*, 199 F.3d 1322 (2d Cir. 1999) (unpublished decision) (affirming district court's grant of summary judgment against plaintiff because of William's failure to provide a statement of material facts in dispute).

Williams's failure to comply with *Rule 28* is sufficiently serious to convince us that we would be within our discretion to summarily dismiss this appeal. We opt, however, to consider the merits of this appeal because plaintiffs' claims are substantial enough to merit a trial, and declining to consider this appeal would unfairly penalize plaintiffs for Williams's failings as an advocate. See *Fed. R. App. P. 2* (providing that this Court may suspend the operation of the Rules of Appellate Procedure in a particular case for good cause). Of course, plaintiffs have been, and continue to be, prejudiced by Williams's unprofessional conduct of this lawsuit, since no small portion of the delay involved in the lawsuit's [*53] twelve-year history is due to counsel's continued failure to present his clients' claims and evidence in a manner that is conducive to adjudication. More importantly, Williams has hardly acted as an effective advocate for his clients by presenting briefs so haphazardly prepared that they contain almost no legal argument. n14

n14 We note that, at oral argument, Williams asserted that "the brief that has been presented here . . . fully complies with" the requirements of *Rule 28*. Since Williams is apparently laboring under the false impression that this brief is an adequate and effective piece of advocacy, we suggest that Williams take advantage of the bar's educational programs on brief writing.

Williams is now on notice that his continued failure to comply with *Rule 28* or any other of the Rules of Appellate Procedure will result in discipline, up to and including suspension or disbarment from practice before this Court. See *Fed. R. App. P. 46(b), (c)* (providing for discipline [*54] or disbarment for attorneys who commit "conduct unbecoming a member of the bar" or who "fail[] to comply with any court rule"). While this Court has so far refrained from disciplining Williams, the sheer number of cases in which his unprofessional conduct has been cited indicates that judicial expressions of disapproval alone have not succeeded in convincing him to alter his behavior. If Williams continues to ignore this Court's rules, however, the Court will not be so forbearing in the future, and will impose sanctions against him.

### CONCLUSION

For the foregoing reasons, the district court's judgment as to plaintiffs' failure to train claim is AFFIRMED. The court's judgment is VACATED in all other respects, and the case is REMANDED for further proceedings.